# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TERRY G. LOPER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-16-398-SPS |
| | ) |
| COMMISSIONER of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Terry G. Loper requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on January 8, 1961, and was fifty-three years old at the time of the most recent administrative hearing (Tr. 120, 741). He has a high school education, attended college two years, and has worked as a unit operator (Tr. 734, 743). The claimant alleges that he has been unable to work since July 28, 2004, due to a neck injury and fusion at C5-7, vertigo, and muscle spasms (Tr. 145, 182).

**Procedural History**

On December 30, 2008, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. His application was denied. ALJ Trace Baldwin conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated August 19, 2010 (Tr. 10-18). The Appeals Council denied review, but this Court reversed the decision of the Commissioner in Case No. CIV-12-137-SPS, and remanded the case for further consideration of the claimant's vertigo and upper extremity numbness (Tr. 772-81). ALJ James Bentley conducted a second administrative hearing and determined that the claimant was not disabled in a written opinion dated November 3, 2014 (Tr. 689-713). The Appeals Council assumed jurisdiction and issued an opinion on July 14, 2016, that adopted the ALJ's November 2014 decision (including the denial of benefits), but revised it to make technical corrections (Tr. 667-70, 878-81). Thus, the Appeals Council's July 2016 decision is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. § 404.981.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), with frequent, but not constant, handling and fingering bilaterally; occasional balancing, stooping, kneeling, and crouching; never crawling, climbing ropes, ladders, or scaffolds, or performing overhead work; and avoiding unprotected heights and dangerous moving machinery (Tr. 693). Additionally, the ALJ determined that the claimant required a sit/stand option, defined as a temporary change in position from sitting to standing and vice versa, for the purposes of comfort, with no more than one change in position every twenty minutes, and without leaving the work area so as not to diminish pace or production (Tr. 693). The ALJ then concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work he could perform in the national economy, *i. e.*, garment bagger, counter clerk, and garment sorter (Tr. 711-13).

**Review**

The claimant contends that the ALJ erred by failing to properly: (i) evaluate the opinions of treating physician, Dr. Archana Barve; and (ii) assess his credibility. The Court finds the claimant's contentions unpersuasive for the following reasons.

The ALJ found that the claimant had the severe impairments of degenerative disc disease of the cervical spine status post fusion at the C5-6 and C6-7 levels, vertigo, and carpal tunnel syndrome (Tr. 691). The relevant medical records reveal that the claimant sustained an injury to his neck at work on December 11, 2003 (Tr. 320). After conservative

treatment failed, he underwent an anterior cervical disc fusion of C5-7 on July 29, 2004 (Tr. 245, 281-82). At a follow-up appointment with Dr. Jeffrey Nees on November 16, 2004, the claimant reported that his condition had not significantly changed from his pre-operative status (Tr. 240). Dr. Nees stated the claimant "looked good radiographically, but was not clinically doing as well as expected," and prescribed a TENS unit (Tr. 240). On January 17, 2005, Dr. Nees noted the claimant should be doing well by all objective measures, but continued to have significant problems (Tr. 239). A cervical spine x-ray taken that day, showed a completely solid fusion in the lower portion of the neck, and no abnormal subluxation, instability, or other change higher in the neck (Tr. 239).

The claimant established care with Dr. Archana Barve on February 17, 2005 (Tr. 597-99). He reported that his symptoms affected his right scapula, right shoulder, and along the right posterolateral arm and forearm into his hand (Tr. 597). Dr. Barve diagnosed the claimant with status post cervical discectomy, C5-6, C6-7 with fusion using allograft bone and anterior plating, neck spasm, and right C7 radiculitis (Tr. 598). She prescribed physical therapy, which the claimant participated in from February 2005 through April 2005 (Tr. 332-33, 337-40, 346-49, 598-99). The claimant also received a series of epidural steroid injections between April 2005 and June 2005 (Tr. Tr. 262-68). An MRI of the claimant's cervical spine conducted on June 6, 2005, revealed that he was status post fusion at C5–C6 and C6–C7, with right uncal vertebral hypertrophy resulting in moderate right foraminal stenosis and possible entrapment of the right C7 nerve (Tr. 411). At a follow-up appointment with Dr. Barve on June 22, 2005, the claimant reported some temporary benefit from the epidural steroid injections, but he continued to complain of neck pain and

stiffness, although he reported overall improvement (592). Dr. Barve stated that she "would be surprised if [the claimant] would fall into anything above a light-duty category." (Tr. 592).

A physical examination on August 8, 2005, revealed possible right C7 radiculitis (Tr. 415-16). The claimant underwent a right C6-7 foraminotomy, facetectomy, and arthrodesis on February 16, 2006 (Tr. 440-47). A May 2006 radiology report revealed a stable fusion at C5–6 and C6–7, with no visible compromise of the spinal canal, and above C5, there was normal range of motion without subluxation or compromise of the spinal canal. (Tr. 435).

The claimant was also diagnosed with carpal tunnel syndrome and had surgery on December 11, 2006. (Tr. 445–446, 472–476). Following this surgery, he complained of intermittent bilateral hand numbness through April 2008 (Tr. 498, 520, 570-73, 578-80). Beginning in December 2009 and continuing through July 2014, the claimant consistently reported tingling in both arms (Tr. 657, 662, 952-73, 983-84, 990-91). The clamant was also treated for vertigo on November 23, 2004, and reported dizziness a number of times, stating that he had to prop himself up on a number of pillows at night in order to prevent dizziness (Tr. 278, 498, 518, 566–67, 593). By November 11, 2008, the claimant reported significant improvement in his vertigo symptoms (Tr. 568). Dr. Barve's cervical range of motion testing was normal and did not trigger any vertigo (Tr. 568). Dr. Barve made similar findings as to the claimant's vertigo at follow-up examinations through October 13, 2011, and did not address the claimant's vertigo at examinations thereafter (Tr. 570, 651, 657, 965-73). The claimant reported a total of nine episodes of vertigo between November

2008 and July 2014, and stated that they only lasted a day with medication (Tr. 662, 954, 960, 963, 966, 969, 972, 983, 990).

At a follow-up appointment with Dr. Barve on August 15, 2006, the claimant reported increased neck pain on his right side (Tr. 586). Dr. Barve indicated that the claimant had exhausted conservative measures, would need to continue with ongoing management, and may have to live with a certain level of pain or discomfort (Tr. 586). By May 1, 2007, Dr. Barve noted the claimant was stable on his medications and at maximum medical improvement, so she scheduled a functional capacity evaluation (Tr. 579). On July 13, 2007, physical therapist Jason Manning conducted a functional capacity evaluation and found that the claimant could perform up to medium work (Tr. 492-95). Dr. Barve released the claimant to medium duty work on July 20, 2007 (Tr. 577). On November 5, 2007, Dr. Barve opined that the claimant could perform medium work, but could not repetitively twist or bend his neck, was limited as to above the chest and overhead work due to his cervical spine restrictions, could lift ten pounds constantly, twenty-five pounds frequently, and fifty pounds occasionally, could push/pull up to twenty-five pounds, but could not climb, crawl, or kneel (Tr. 574-75). Dr. Barve noted on April 28, 2008, that the claimant's employer was unable to accommodate his medium duty restrictions (Tr. 571). A cervical MRI conducted on November 19, 2008, revealed a bony mechanical fusion and discectomy at C5 through C7, mild left and minimal right neural foraminal narrowing with minimal central canal stenosis at C3-4, and minimal bilateral neural foraminal narrowing with minimal central canal stenosis at C4-5 and C7-T1 (Tr. 543). An EMG study conducted the same day revealed carpal tunnel syndrome, right worse than in 2005, and

mild chronic C7 radiculopathy, but the left EMG was normal (Tr. 515-16). On January 6, 2009, Dr. Barve found the claimant was significantly improved, and her physical examination was normal (Tr. 570). Thereafter, and continuing through July 29, 2014, the claimant frequently reported that his symptoms remained "status quo" or that he was stable overall, and Dr. Barve's physical examinations revealed a normal gait pattern, independent transfers, and functional cervical range of motion (Tr. 651, 657-59, 662, 952-73, 983-85, 990-91).

On January 1, 2010, Dr. Barve completed a Medical Source Statement ("MSS") wherein she opined that the claimant could lift 10 pounds frequently and 20 pounds occasionally, push/pull up to fifty pounds occasionally, stand and/or walk less two hours total in an eight-hour workday for one to two hours at a time, sit for less than two hours total in an eight-hour workday for forty-five minutes at a time, and was required to lie down during the day to manage pain (Tr. 655-56). Additionally, she stated that the claimant could never climb due to vertigo, and could only occasionally balance, stoop, kneel, crouch, crawl, reach, and feel (Tr. 656). She also found that the claimant had environmental restrictions regarding height due to intermittent vertigo (Tr. 656). Dr. Barve based these limitations on the claimant's chronic neck pain, shoulder pain, upper extremity pain, chronic headaches, right arm numbness and tingling, and intermittent vertigo, as well as the functional capacity evaluation, clinical notes, and radiology studies. She indicated that her assessment applied from July 13, 2007 through the date of her opinion (Tr. 656).

Dr. Barve completed another MSS on June 13, 2014 (Tr. 987-88). She opined that the claimant could lift 10 pounds frequently and 20 pounds occasionally, push/pull up to

twenty pounds, stand and/or walk less two hours total in an eight-hour workday for one hour at a time, sit for less than six hours total in an eight-hour workday for one hour at a time, and was required to lie down during the day to manage pain (Tr. 987-88). Additionally, she stated that the claimant could never climb, balance, crawl, or feel, and could only occasionally stoop, kneel, crouch, reach, handle, and finger (Tr. 988). She also found that the claimant had the environmental restriction of no heights due to intermittent vertigo (Tr. 988). Dr. Barve based these limitations on the claimant's chronic neck pain, shoulder pain with bilateral hand paresthesia and numbness, and intermittent vertigo with nausea and balance problems (Tr. 988). She indicated that her assessment applied from January 5, 2010, through the date of her opinion (Tr. 988).

On September 18, 2014, Dr. Barve wrote a letter summarizing the claimant's treatment history for his neck impairment, and his functional capacity evaluation (Tr. 994). She then indicated that since that time, the claimant continued to experience significant neck pain, headaches, vertigo, and bilateral upper extremity paresthesia (Tr. 994). She stated that the claimant "barely manages pain levels that are under 5 or 6 out of 10 with a significant quantity of various medications," and opined that the claimant could not sustain a "regular" job (Tr. 994).

At the most recent administrative hearing, the claimant testified that he has cattle on his 160-acre farm, that he sells at an auction approximately once every three months (Tr. 728-29). He further testified that he, along with his wife and son, load the cattle into his trailer (Tr. 730). He stated that he helps some with repairing fences and maintaining the pastures, but that his son does the majority of it (Tr. 730). The claimant indicated that his

most significant limitation that prevented him from working was his muscle spasms (Tr. 735). He stated that they would start in his neck on the right side, go across his right shoulder, and trigger numbness in his arms down to his fingers, and that medication helped (Tr. 735). He further stated that he had significant pain after his muscle spasms began, as well as numbness in his fingers, and intermittent vertigo (Tr. 736-37). The claimant testified his pain medication made him feel "floaty" for thirty minutes, and that a TENS unit helped with his muscle spasms (Tr. 736, 740). Additionally, the claimant reported the day before the hearing, he got his granddaughter ready for school, picked up tree limbs from his front yard, and "more or less work[ed] in the yard." (Tr. 740).

The claimant first argues that the ALJ erred in assessing Dr. Barve's opinions. Medical opinions from a treating physician are entitled to controlling weight if they are "'well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record.'" *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If a treating physician's opinions are not entitled to controlling weight, the ALJ must determine the proper weight to give them by analyzing the factors set forth in 20 C.F.R. §§ 404.1527, 416.927. *Langley*, 373 F.3d at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § [404.1527].'"), *quoting Watkins*, 350 F.3d at 1300. Those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination

or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-01, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) [quotation omitted]. Finally, if the ALJ decides to reject a treating physician's opinions entirely, "he must . . . give specific, legitimate reasons for doing so[,]" *id*. at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 [quotation omitted].

In his written opinion, the ALJ summarized the claimant's hearing testimony and the medical record. He declined to give Dr. Barve's opinions controlling weight because he found they were inconsistent with other substantial evidence in the file, specifically: (i) her own treatment notes that showed routine follow-up every three months for chronic pain management, identical examination findings from January 2009 through July 2014, stable symptoms, and that the claimant consistently was not in obvious stress at rest, had a normal gait pattern, independent transfers, and functional cervical spine range of motion that did not trigger vertigo; (ii) the July 2007 functional capacity evaluation; (iii) her treatment notes that showed no significant changes in complaints or examination findings between her November 2007 opinion and her January 2010 opinion; (iv) her calculation of the cost of four follow-up visits per year and an annual drug screen in connection with the claimant's workers compensation claim; (v) her statement in February 2010 that she would

schedule a CT scan and refer the claimant to a specialist if his symptoms worsened, and then not doing so; (vi) the claimant's testimony that he maintained approximately forty head of cattle on 160 acres of land, rode to Denver for a banquet, and cleaned storm debris from his lawn the day before the administrative hearing; (vii) the November 2008 cervical MRI; (viii) the November 2008 EMG study; and (ix) the determination that cervical spine surgery and further carpal/cubital tunnel surgery were not indicated (Tr. 705).

The ALJ then gave some weight to Dr. Barve's opinions, and adopted her findings that the claimant could perform no more than light work, was restricted from exposure to (unprotected) heights, and could not crawl (Tr. 706-07). Additionally, the ALJ adopted Dr. Barve's opinion that the claimant was limited in his ability to work overhead, but further restricted him to no overhead work in light of his neck pain (Tr. 707). The ALJ then rejected the following limitations from Dr. Barve's opinions: (i) the "rather restricted" limitations as to the claimant's ability to sit/stand/walk, noting that her own treatment notes indicated he was in no obvious stress at rest, his gait was normal, and his transfers were independent; (ii) the claimant's inability to climb, finding instead that he should have no restriction in climbing ramps or stairs because his gait pattern was normal, his transfers were independent, and there was no indication of difficulty with lower extremity strength, motor reflexes, or range of motion; (iii) the claimant's inability to bend or twist his neck, noting such limitations were inconsistent with her repeated examinations showing full functional range of motion in his cervical spine; (iv) the claimant's ability to occasionally handle, finger, and feel, noting he had "superb" grip strength, and calloused hands on examinations two years apart, and testified that he was picking up storm debris the day

before the administrative hearing; (v) the claimant's inability to balance, noting that he never complained of balance difficulty and that Dr. Barve never found balance difficulty on examination; and (vi) the claimant's need to lie down during the day to manage pain because such limitation was not indicated in the record (Tr. 705-07).

Accordingly, the ALJ adequately discussed and analyzed each of the Dr. Barve's opinions contained in the record. His findings indicate that he considered each opinion in turn and gave reasons for adopting or not adopting the limitations described in them. Accordingly, he did not commit error in failing to include further limitations for the claimant's RFC. *See, e. g., Best-Willie v. Colvin,* 514 Fed. Appx. 728, 737 (10th Cir. 2013) ("Having reasonably discounted the opinions of Drs. Hall and Charlat, the ALJ did not err in failing to include additional limitations in her RFC assessment.").

Finally, the claimant contends that the ALJ erred in analyzing his credibility because he improperly relied on minimal daily activities and did not make specific findings with respect to his pain. Under the applicable standard at the time of the ALJ's decision, a credibility determination would be entitled to deference unless there is some indication that the ALJ misread the medical evidence as a whole. *Casias,* 933 F.2d at 801. An ALJ could disregard a claimant's subjective complaints of pain if unsupported by any clinical findings. *Frey v. Bowen,* 816 F.2d 508, 515 (10th Cir. 1987). But the ALJ's credibility findings were required to be "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) [citation omitted]. A credibility determination "must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in

the regulations.'" *Hardman v. Barnhart*, 362 F.3d 676, 678 (10th Cir. 2004), *quoting* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4 (July 2, 1996). In this case, the Court finds that the ALJ set out the appropriate credibility factors, and cited evidence supporting his reasons for finding that the claimant's subjective complaints were not believable to the extent alleged, *i. e.*, he gave clear and specific reasons that were specifically linked to the evidence in the record. Specifically, the ALJ noted inconsistencies between the claimant's testimony and: (i) the treatment notes and examination findings of his treating physicians, particularly Dr. Barve, and Dr. Nees; (ii) his application for unemployment benefits; (iii) the objective evidence, including the November 2008 cervical MRI and EMG; and (iv) his daily activities. Accordingly, the ALJ's determination here is entitled to deference and the Court finds no error in analyzing the claimant's credibility.[2]

### Conclusion

In summary, the Court finds that correct legal standards were applied by the ALJ, and the decision of the Commissioner is therefore supported by substantial evidence. The decision of the Commissioner of the Social Security Administration is accordingly hereby AFFIRMED.

**DATED** this 26th day of March, 2018.

_____
**STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE**

---

[2] The Court notes that the Social Security Administration eliminated the term "credibility" in Soc. Sec. Rul. 16-3p, 2016 WL 1119029 (Mar. 16, 2016), and has provided new guidance for evaluating statements pertaining to intensity, persistence, and limiting effects of symptoms in disability claims. The Court finds that even under the new standard, the ALJ properly evaluated the claimant's credibility.